# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dawn Lockwood Fleischer, a California consumer; Patricia L. Lien, a Minnesota consumer; Patrick Roberts, a Texas consumer; Patty A. Donley, a Florida consumer; Paul Campbell, a Florida consumer; Paul Sweeney, a Oklahoma consumer; Paul Richard, a Florida consumer; Paul Rogers, a Indiana consumer; Pearl Wiley, a Texas consumer; Peter Streicher, a Florida consumer; Peter Sirois, a Connecticut consumer; Peter Varlan, a New York consumer; Phil Senter, a North Carolina consumer; Philip Burton, a Indiana consumer; Portia Pankey, a Ohio consumer; Randy Powell, a Oklahoma consumer; Raymond Richkus, a New Jersey consumer; Regina Dow, a Maryland consumer; Richard Aloisi, a New Jersey consumer; Richard Gulotta, a New Jersey consumer; Richard Juttner, a Oregon consumer; Richard Lombard, a North Carolina consumer; Richard Norman Westney Sr., a New Hampshire consumer; Richard Ray Pelham, a Florida consumer; Rigoberto Arguera, a Texas consumer; Robert Basore, a Ohio consumer; Robert Burns, a California consumer; Robert Crosby, a Colorado consumer; Robert Furtado, a Massachusetts consumer; Robert Angel, a Florida consumer; Robert Greene, a Indiana consumer; Robert L. Brinson Jr., a Texas consumer; Ronald Geddes, a Pennsylvania consumer; Ronald Abbatecola Jr., a North Carolina consumer; Ronney Porter, a North Carolina consumer; Rosana Sickler, a Florida consumer; Royce Palmer, a Texas consumer; Russell Smart, a Minnesota consumer; Sandra Wruble, a Pennsylvania consumer; Sarah Strohbach-Mejia, a California consumer; Scott Brown, a Indiana consumer; Seldon Brannan, a Oregon consumer; Sergio Pena, a New York consumer; Shirley Domzalski, a Georgia consumer; Steven Bennett, a Florida consumer; Summer Friesland, a North Carolina consumer; Sylvia Bechtel, a Indiana consumer; Sylvia Maltbie, a Alabama consumer; Terri Quick, a Pennsylvania consumer; Theresa Berkobien, a Michigan consumer; Thomas Haner, a Texas consumer; Timothy Kosek, a Minnesota consumer; Tina Leird, a Florida consumer; Trudy Fisher, a New Jersey consumer; Wanda Jo Rollen, a Texas consumer; Wanda Menard, a Louisiana consumer; William Famolare, a Massachusetts consumer; William ODell, a New York consumer; Yaniz Vega, a Florida consumer; <br><br> *Plaintiff*, <br><br> v. <br><br> MONSANTO COMPANY, <br><br> *Defendant*. | MDL NO. 2741 <br><br> CASE NO. 16-MD-02741-VC <br><br> CIVIL ACTION NO.:_____ <br><br> COMPLAINT AND DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiffs by and through their attorneys respectfully submit the following Complaint and Jury Demand against Monsanto Company ("Defendant" or "Monsanto"), and alleges the following:

## NATURE OF THE ACTION

1.     This action seeks to recover damages for the injuries sustained by Plaintiffs as the direct and proximate result of the wrongful conduct and negligence of the Defendant in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distributing, labeling, and selling of the herbicide Roundup®, containing the active ingredient glyphosate.

2.     Plaintiffs maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsustainable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

3.     Plaintiffs' injuries, like those striking thousands of similarly situated victims across the country, were unavoidable.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction on Defendant pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant. Defendant is either incorporated and/or has their principal place of business outside of the state in which Plaintiffs reside.

5.     The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.     There is complete diversity of citizenship between Plaintiffs and Defendant. Defendant is an entity organized in Delaware and maintains a principal place of business in

1

Missouri, as set forth more fully below. Plaintiffs are residents and citizens of states other than the States of Delaware and Missouri.

7.      Defendant maintains sufficient contacts with the State of California such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

8.      Venue is proper in this District pursuant to 28 U.S.C.§ 1391 (b)(2), because Defendant marketed, advertised, and distributed the dangerous products in this District. Defendant does substantial business in the State of California and within the District; and at all times relevant hereto, Defendants developed, manufactured, promoted, marketed, distributed, warranted, and sold Roundup® in interstate commerce. Further, Defendant, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## PARTIES

9.      Plaintiffs are citizens and residents in states other than Missouri and Delaware. Plaintiffs bring this action for personal injuries sustained by Plaintiffs' exposure to Roundup® ("Roundup"), which contained the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Plaintiffs developed Non-Hodgkin's Lymphoma.

10.      "Roundup" refers to all formulations of Defendant's Roundup products that contain the active ingredient glyphosate.

11.      Defendant, Monsanto Company, is a Delaware corporation in "active" status with a principle place of business in St. Louis, Missouri.

12.      At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the

active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

## FACTUAL ALLEGATIONS

13.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/ or has acquired and is responsible for the commercial herbicide Roundup.

14.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

15.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

16.     Glyphosate is the active ingredient in Roundup.

17.     Glyphosate is a broad spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

18.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

19.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

20.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

21.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

22.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

23.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1] For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

24.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

25.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

26.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

27.     The EPA and the State of Alabama registered Roundup for distribution, sale, and manufacture in the United States and in the State of Alabama.

28.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

29.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

30.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment

pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

<u>**MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®**</u>

31.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a.     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customer's driveways, sidewalks, and fences …

b.     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got weed, brush, edging, or trimming problem.

c.     Roundup biodegraded into naturally occurring elements.

d.     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customer's shrubs or other desirable vegetation.

e.     This non-residual herbicide will not wash or leach in the soil. It … stays where you put it.

f.    You can apply Roundup with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g.    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.    Glyphosate's safety margin is much greater than required. It has over 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.    You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

32.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.    its glyphosate–containing pesticide products or any component thereof are safe, non-toxic, harmless, or free of risk.

b.    its glyphosate–containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

---

[2]  Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Laws § 63(15) (Nov.1996).

    c.    its glyphosate–containing pesticide products or any component thereof stays where they are applied under all circumstances and will not move through the environment by any means.

    d.    its glyphosate–containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics"

    e.    its glyphosate–containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

    f.    its glyphosate –containing pesticide products or any component thereof might be classified as "practically non-toxic."

33.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

34.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

35.    As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

36.    On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

---

[3] Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at
http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

37.    In 1986, the EPA issues a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

38.    In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

39.    In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in the Defendant Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

40.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/CYclin B Activation."

41.    The study found that Defendant Roundup caused delays in the cell cycles of sea urchin, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

42.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

---

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991

43. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

44. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

45. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

46. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

47. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

48. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

---

[9] (Molinari, 2000; Stewart et al., 2003)

49.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup.

50.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

51.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup.

52.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant economic interests rather than Plaintiffs and the consuming public.

53.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

54.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

55.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

56.    IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer- reviewed data.

57.    On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant possession since as early as 985, the IARC's working group published its conclusion that the glyphosate contained in Defendant Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

58.    The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

59.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

60.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

61.    Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

62.    Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

63.    In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

64.    The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

65.    Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

66.    Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

67.    The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

68.    In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

69.    The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

70.    The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

71.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

72.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

73.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

74.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

75.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

76.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

77.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

78.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

79.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

80.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

81.     This strengthened previous associations between glyphosate and NHL.

82.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

83.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Defendant Roundup for Defendant pecuniary gain, and in fact, did induce Plaintiffs to use Roundup.

84.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiffs and the general public.

85.     Notwithstanding Defendant representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

86.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

87.     Defendant failed to appropriately and adequately inform and warn Plaintiffs of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical

pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

88.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non- genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

89.     Defendant has claimed and continued to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

**SCIENTIFIC FRAUD UNDERLYING
THE SAFETY DETERMINATION OF GLYPHOSATE**

90.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

91.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

92.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

93.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

94.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

95.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

96.    Three top executives of IBT were convicted of fraud in 1983.

97.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

98.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

99.    The investigation led to the indictments of the laboratory owner and a handful of employees.

**MONSANTO'S CONTINUING DISREGARD FOR THE
SAFETY OF PLAINTIFFS AND THE PUBLIC**

100.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup

17

brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

101.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

102.    Glyphosate, and Defendant Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

103.    Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

104.    Despite Defendant knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant promotional campaigns focused on Roundup's purported "safety profile."

105.    Defendant's failure to adequately warn Plaintiffs resulted in (1) Plaintiffs using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

106.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

107.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

108.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

109.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

110.    By reason of the foregoing acts and omissions, Plaintiffs seeks compensatory damages as a result of Plaintiffs' use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiffs to suffer from cancer, specifically NHL, and Plaintiffs suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

111.    By reason of the foregoing, Plaintiffs are severely and permanently injured.

112.    By reason of the foregoing acts and omissions, Plaintiffs have endured and, in some categories continue to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

## PLAINTIFFS' EXPOSURE TO ROUNDUP

113.    Plaintiff, Dawn Lockwood Fleischer, is a resident of the city of Palmdale, and the state of California. She was a resident of the same state at the time of her diagnosis. Plaintiff, Dawn Lockwood Fleischer, was exposed to Roundup at her home in California. She used Roundup from 2000 until 2008. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in November 2008 and received treatment in Lancaster, California.

114.    Plaintiff, Patricia L. Lien, is a resident of the city of Hutchinson, and the state of Minnesota. She was a resident of the same state at the time of her diagnosis. Plaintiff, Patricia L. Lien, was exposed to Roundup at her place of work as a farmer and at her home in Minnesota.

She used Roundup from 1985 until 2017. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in January 2017 and received treatment in Minneapolis, Minnesota.

115.    Plaintiff, Patrick Roberts, is a resident of the city of Kerville, and the state of Texas. He was a resident of the same state at the time of his diagnosis. Plaintiff, Patrick Roberts, was exposed to Roundup at his home in Texas. He used Roundup from 1974 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in August 2019 and received treatment in Kerrville, Texas.

116.    Plaintiff, Patty A. Donley, is a resident of the city of Englewood, and the state of Florida. She was a resident of the same state at the time of her diagnosis. Plaintiff, Patty A. Donley, was exposed to Roundup at her home in Florida and Virginia. She used Roundup from 1991 until 2016. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in February 2006 and received treatment in Port Charlotte, Florida.

117.    Plaintiff, Paul Campbell, is a resident of the city of Jacksonville, and the state of Florida. He was a resident of the same state at the time of his diagnosis. Plaintiff, Paul Campbell, was exposed to Roundup at his home in Florida. He used Roundup from 1981 until 2017. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in March 2018 and received treatment in Jacksonville, Florida.

118.    Plaintiff, Paul Sweeney, is a resident of the city of Sapulpa, and the state of Oklahoma. He was a resident of the same state at the time of his diagnosis. Plaintiff, Paul Sweeney, was exposed to Roundup at his place of work as a groundskeeper and at his home in Oklahoma. He used Roundup from 1978 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in October 2018 and received treatment in Tulsa, Oklahoma.

119.    Plaintiff, Paul Richard, is a resident of the city of Pinellas Park, and the state of Florida. He was a resident of the same state at the time of his diagnosis. Plaintiff, Paul Richard, was exposed to Roundup at his home in Florida and Massachusetts. He used Roundup from 1988 until 2016. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in October 2018 and received treatment in Tampa, Florida.

120.    Plaintiff, Paul Rogers, is a resident of the city of Marion, and the state of Indiana. He was a resident of the same state at the time of his diagnosis. Plaintiff, Paul Rogers, was exposed to Roundup at his home in Indiana. He used Roundup from 2002 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in June 2008 and received treatment in Marion, Indiana.

121.    Plaintiff, Pearl Wiley, is a resident of the city of Houston, and the state of Texas. She was a resident of the same state at the time of her diagnosis. Plaintiff, Pearl Wiley, was exposed to Roundup at her home in Texas. She used Roundup from 2016 until 2017. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in August 2018 and received treatment in Houston, Texas.

122.    Plaintiff, Peter Streicher, is a resident of the city of Valrico, and the state of Florida. He was a resident of the same state at the time of his diagnosis. Plaintiff, Peter Streicher, was exposed to Roundup at his home in Florida and North Carolina. He used Roundup from 2001 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the year 2019 and received treatment in Tampa, Florida.

123.    Plaintiff, Peter Sirois, is a resident of the city of Manchester, and the state of Connecticut. He was a resident of the same state at the time of his diagnosis. Plaintiff, Peter Sirois, was exposed to Roundup at his home in Connecticut. He used Roundup from 1978 until

2006. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in December 2016 and received treatment in Wethersfield, Connecticut.

124.    Plaintiff, Peter Varlan, is a resident of the city of Webster, and the state of New York. He was a resident of the same state at the time of his diagnosis. Plaintiff, Peter Varlan, was exposed to Roundup at his home in New York. He used Roundup from 1974 until 2015. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in June 2013 and received treatment in Rochester, New York.

125.    Plaintiff, Phil Senter, is a resident of the city of Siler City, and the state of North Carolina. He was a resident of the same state at the time of his diagnosis. Plaintiff, Phil Senter, was exposed to Roundup at his place of work in North Carolina. He used Roundup from 1977 until 1997. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in March 2019 and received treatment in Chapel Hill, North Carolina.

126.    Plaintiff, Philip Burton, is a resident of the city of Kokomo, and the state of Indiana. He was a resident of the same state at the time of his diagnosis. Plaintiff, Philip Burton, was exposed to Roundup at his family farm in Indiana. He used Roundup from 1977 until 2018. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in November 2015 and received treatment in Kokomo, Indiana.

127.    Plaintiff, Portia Pankey, is a resident of the city of Columbus, and the state of Ohio. She was a resident of the same state at the time of her diagnosis. Plaintiff, Portia Pankey, was exposed to Roundup at her home in Ohio. She used Roundup from 1984 until 2017. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the year 2008 and received treatment in Columbus, Ohio.

128.    Plaintiff, Randy Powell, is a resident of the city of Buffalo, and the state of Oklahoma. He was a resident of the same state at the time of his diagnosis. Plaintiff, Randy Powell, was exposed to Roundup at his family farm in Wisconsin. He used Roundup from 1974 until 1978. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in March 2019 and received treatment in Wichita, Kansas.

129.    Plaintiff, Raymond Richkus, is a resident of the city of Annandale, and the state of New Jersey. He was a resident of the same state at the time of his diagnosis. Plaintiff, Raymond Richkus, was exposed to Roundup at his home in New Jersey. He used Roundup from 1979 until 2010. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in October 2009 and received treatment in Flemington, New Jersey.

130.    Plaintiff, Regina Dow, is a resident of the city of Timonium, and the state of Maryland. She was a resident of the same state at the time of her diagnosis. Plaintiff, Regina Dow, was exposed to Roundup at her home in Maryland. She used Roundup from 1976 until 1998. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the summer of 2006 and received treatment in Glen Burnie, Maryland.

131.    Plaintiff, Richard Aloisi, is a resident of the city of Port Monmouth, and the state of New Jersey. He was a resident of the same state at the time of his diagnosis. Plaintiff, Richard Aloisi, was exposed to Roundup at his home in New Jersey. He used Roundup from 1982 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in November 2007 and received treatment in Little Silver, New Jersey.

132.    Plaintiff, Richard Gulotta, is a resident of the city of Long Branch, and the state of New Jersey. He was a resident of the same state at the time of his diagnosis. Plaintiff, Richard Gulotta, was exposed to Roundup at his home in New Jersey. He used Roundup from 1995  until

2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in December 2018 and received treatment in Oakhurst, New Jersey.

133.    Plaintiff, Richard Juttner, is a resident of the city of Klamath Falls, and the state of Oregon. He was a resident of the same state at the time of his diagnosis. Plaintiff, Richard Juttner, was exposed to Roundup at his home in Oregon. He used Roundup from 1987 until 2000. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the year 2014 and received treatment in Portland, Oregon.

134.    Plaintiff, Richard Lombard, is a resident of the city of New Bern, and the state of North Carolina. He was a resident of the same state at the time of his diagnosis. Plaintiff, Richard Lombard, was exposed to Roundup at his home in Vermont. He used Roundup from 1985 until 2011. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in November 2014 and received treatment in New Bern, North Carolina.

135.    Plaintiff, Richard Norman Westney Sr., is a resident of the city of North Walpole, and the state of New Hampshire. He was a resident of the same state at the time of his diagnosis. Plaintiff, Richard Norman Westney Sr., was exposed to Roundup at his home in New Hampshire. He used Roundup from the 1990's until 2017. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the year 2015 and received treatment in Keene, New Hampshire.

136.    Plaintiff, Richard Ray Pelham, is a resident of the city of Lakeland, and the state of Florida. He was a resident of the same state at the time of his diagnosis. Plaintiff, Richard Ray Pelham, was exposed to Roundup at his home in Florida. He used Roundup from 1983 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in December 2018 and received treatment in Lakeland, Florida.

137.    Plaintiff, Rigoberto Arguera, is a resident of the city of Fresno, and the state of Texas. He was a resident of the same state at the time of his diagnosis. Plaintiff, Rigoberto Arguera, was exposed to Roundup at his home in Texas. He used Roundup from 2005 until 2008. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in July 2009 and received treatment in Houston, Texas.

138.    Plaintiff, Robert Basore, is a resident of the city of Miamisburg, and the state of Ohio. He was a resident of the same state at the time of his diagnosis. Plaintiff, Robert Basore, was exposed to Roundup at his home in Ohio. He used Roundup from 1995 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in August 2009 and received treatment in Dayton, Ohio.

139.    Plaintiff, Robert Burns, is a resident of the city of Placerville, and the state of California. He was a resident of the same state at the time of his diagnosis. Plaintiff, Robert Burns, was exposed to Roundup at his home in California. He used Roundup from 1980 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in July 2014 and received treatment in Sacramento, California.

140.    Plaintiff, Robert Crosby, is a resident of the city of Lafayette, and the state of Colorado. He was a resident of the same state at the time of his diagnosis. Plaintiff, Robert Crosby, was exposed to Roundup at his place of work and at his home in Minnesota. He used Roundup from 1996 until 2014. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in August 2015 and received treatment in Lafayette, Colorado.

141.    Plaintiff, Robert Furtado, is a resident of the city of Taunton, and the state of Massachusetts. He was a resident of the same state at the time of his diagnosis. Plaintiff, Robert Furtado, was exposed to Roundup at his at home in Massachusetts. He used Roundup from 1991

until 1995. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the year 1995 and received treatment in North Dartmouth, Massachusetts.

142.    Plaintiff, Robert Angel, is a resident of the city of Bradenton, and the state of Florida. He was a resident of the same state at the time of his diagnosis. Plaintiff, Robert Angel, was exposed to Roundup at his at his place of work as a contractor and at his home in Louisiana. He used Roundup from 1980 until 2012. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the summer of 2010 and received treatment in Shreveport, Louisiana.

143.    Plaintiff, Robert Greene, is a resident of the city of Wabash, and the state of Indiana. He was a resident of the same state at the time of his diagnosis. Plaintiff, Robert Greene, was exposed to Roundup at his home in Indiana. He used Roundup from 1975 until 2015. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in November 2015 and received treatment in Wabash, Indiana.

144.    Plaintiff, Robert L. Brinson Jr., is a resident of the city of Cibolo, and the state of Texas. He was a resident of the same state at the time of his diagnosis. Plaintiff, Robert L. Brinson Jr., was exposed to Roundup at his home in Georgia and Texas. He used Roundup from 1977 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in June 2016 and received treatment in San Antonio, Texas.

145.    Plaintiff, Ronald Geddes, is a resident of the city of Ellwood City, and the state of Pennsylvania. He was a resident of the same state at the time of his diagnosis. Plaintiff, Ronald Geddes, was exposed to Roundup at his home in Pennsylvania. He used Roundup from 1992 until 1999. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in August 1999 and received treatment in Pittsburgh, Pennsylvania.

146.    Plaintiff, Ronald Abbatecola Jr., is a resident of the city of Gibsonville, and the state of North Carolina. He was a resident of the same state at the time of his diagnosis. Plaintiff, Ronald Abbatecola Jr., was exposed to Roundup at his place of work in New York and North Carolina. He used Roundup from 1990 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in December 2015 and received treatment in Burlington, North Carolina.

147.    Plaintiff, Ronney Porter, is a resident of the city of Concord, and the state of North Carolina. He was a resident of the same state at the time of his diagnosis. Plaintiff, Ronney Porter, was exposed to Roundup at his home in North Carolina. He used Roundup from 2000 until 2017. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in December 2016 and received treatment in Concord, North Carolina.

148.    Plaintiff, Rosana Sickler, is a resident of the city of Deland, and the state of Florida. She was a resident of the same state at the time of her diagnosis. Plaintiff, Rosana Sickler, was exposed to Roundup at her home in New Jersey. She used Roundup from 1978 until 2008. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in March 2008 and received treatment in Trenton, New Jersey.

149.    Plaintiff, Royce Palmer, is a resident of the city of Henderson, and the state of Texas. He was a resident of the same state at the time of his diagnosis. Plaintiff, Royce Palmer, was exposed to Roundup at his home in Texas. He used Roundup from 2007 until 2018. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in January 2019 and received treatment in Longview, Texas.

150.    Plaintiff, Russell Smart, is a resident of the city of Bemidji, and the state of Minnesota. He was a resident of the same state at the time of his diagnosis. Plaintiff, Russell Smart, was exposed to Roundup at his family farm in Minnesota. He used Roundup from for 15

years. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in March 2011 and received treatment in Bemidji, Minnesota.

151.    Plaintiff, Sandra Wruble, is a resident of the city of Northampton, and the state of Pennsylvania. She was a resident of the same state at the time of her diagnosis. Plaintiff, Sandra Wruble, was exposed to Roundup at her home in Pennsylvania. She used Roundup from the 1970's until 2016. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the year 2014 and received treatment in Allentown, Pennsylvania.

152.    Plaintiff, Sarah Strohbach-Mejia, is a resident of the city of Temecula, and the state of California. She was a resident of the same state at the time of her diagnosis. Plaintiff, Sarah Strohbach-Mejia, was exposed to Roundup at her home in California. She used Roundup from the 1980's until 2017. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in March 2018 and received treatment in Murrieta, California.

153.    Plaintiff, Scott Brown, is a resident of the city of Elkhart, and the state of Indiana. He was a resident of the same state at the time of his diagnosis. Plaintiff, Scott Brown, was exposed to Roundup at his At home in Indiana and Michigan. He used Roundup from 1986 until 2017. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in February 2003 and received treatment in Chicago, Illinois.

154.    Plaintiff, Seldon Brannan, is a resident of the city of Depoe Bay, and the state of Oregon. He was a resident of the same state at the time of his diagnosis. Plaintiff, Seldon Brannan, was exposed to Roundup at his At home in California and Oregon. He used Roundup from 1976 until 2018. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the fall of 2016 and received treatment in Lincoln City, Oregon.

155.    Plaintiff, Sergio Pena, is a resident of the city of Baldwin, and the state of New York. He was a resident of the same state at the time of his diagnosis. Plaintiff, Sergio Pena, was exposed to Roundup at his place of work and at his home in New York. He used Roundup from 2009 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in November 2017 and received treatment in Oceanside, New York.

156.    Plaintiff, Shirley Domzalski, is a resident of the city of Grovetown, and the state of Georgia. She was a resident of the same state at the time of her diagnosis. Plaintiff, Shirley Domzalski, was exposed to Roundup at her home in Georgia. She used Roundup from 1974 until 2013. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the fall of 2011 and received treatment in Fort Gordon, Georgia.

157.    Plaintiff, Steven Bennett, is a resident of the city of Pensacola, and the state of Florida. He was a resident of the same state at the time of his diagnosis. Plaintiff, Steven Bennett, was exposed to Roundup at his place of work and at his home in Alabama and Florida. He used Roundup from 1983 until 2018. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in October 2017 and received treatment in Pensacola, Florida.

158.    Plaintiff, Summer Friesland, is a resident of the city of Lenoir, and the state of North Carolina. She was a resident of the same state at the time of her diagnosis. Plaintiff, Summer Friesland, was exposed to Roundup at her home in North Carolina. She used Roundup from the 1990's until 2018. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in January 2019 and received treatment in Lenoir, North Carolina.

159.    Plaintiff, Sylvia Bechtel, is a resident of the city of Elnora, and the state of Indiana. She was a resident of the same state at the time of her diagnosis. Plaintiff, Sylvia Bechtel, was exposed to Roundup at her home in Indiana. She used Roundup from 1979 until

2000. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in April 2006 and received treatment in Indianapolis, Indiana.

160.     Plaintiff, Sylvia Maltbie, is a resident of the city of Rainbow City, and the state of Alabama. She was a resident of the same state at the time of her diagnosis. Plaintiff, Sylvia Maltbie, was exposed to Roundup at her home in Alabama. She used Roundup from 1975 until 2017. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the summer of 2014 and received treatment in Birmingham, Alabama.

161.     Plaintiff, Terri Quick, is a resident of the city of York, and the state of Pennsylvania. She was a resident of the same state at the time of her diagnosis. Plaintiff, Terri Quick, was exposed to Roundup at her home in Pennsylvania. She used Roundup from 1985 until 2018. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in September 2018 and received treatment in York, Pennsylvania.

162.     Plaintiff, Theresa Berkobien, is a resident of the city of Saginaw, and the state of Michigan. She was a resident of the same state at the time of her diagnosis. Plaintiff, Theresa Berkobien, was exposed to Roundup at her home in Michigan. She used Roundup from 1974 until the 1980's. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in August 2019 and received treatment in Saginaw, Michigan.

163.     Plaintiff, Thomas Haner, is a resident of the city of Houston, and the state of Texas. He was a resident of the same state at the time of his diagnosis. Plaintiff, Thomas Haner, was exposed to Roundup at his home in Texas. He used Roundup from 1981 until 1984. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the year 2015 and received treatment in Houston, Texas.

164.    Plaintiff, Timothy Kosek, is a resident of the city of Winsted, and the state of Minnesota. He was a resident of the same state at the time of his diagnosis. Plaintiff, Timothy Kosek, was exposed to Roundup at his place of work in Minnesota. He used Roundup from the 1980's until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in November 2017 and received treatment in Waconia, Minnesota.

165.    Plaintiff, Tina Leird, is a resident of the city of Gibsonton, and the state of Florida. She was a resident of the same state at the time of her diagnosis. Plaintiff, Tina Leird, was exposed to Roundup at her home in Florida. She used Roundup from 2008 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in around 2010 and received treatment in Lakeland, Florida.

166.    Plaintiff, Trudy Fisher, is a resident of the city of Monroe Township, and the state of New Jersey. She was a resident of the same state at the time of her diagnosis. Plaintiff, Trudy Fisher, was exposed to Roundup at her home in New Jersey. She used Roundup from 1995 until 2015. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the summer of 2013 and received treatment in Basking Ridge, New Jersey.

167.    Plaintiff, Wanda Jo Rollen, is a resident of the city of Burleson, and the state of Texas. She was a resident of the same state at the time of her diagnosis. Plaintiff, Wanda Jo Rollen, was exposed to Roundup at her home in Texas. She used Roundup from 1980 until 2016. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in January 2013 and received treatment in Houston, Texas.

168.    Plaintiff, Wanda Menard, is a resident of the city of Youngsville, and the state of Louisiana. She was a resident of the same state at the time of her diagnosis. Plaintiff, Wanda Menard, was exposed to Roundup at her home in Louisiana. She used Roundup from 1995 until

2014. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in April 2014 and received treatment in Lafayette, Louisiana.

169.     Plaintiff, William Famolare, is a resident of the city of Revere, and the state of Massachusetts. He was a resident of the same state at the time of his diagnosis. Plaintiff, William Famolare, was exposed to Roundup at his home in Massachusetts. He used Roundup from 1974 until 1992. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in October 2010 and received treatment in Boston, Massachusetts.

170.     Plaintiff, William ODell, is a resident of the city of Great Valley, and the state of New York. He was a resident of the same state at the time of his diagnosis. Plaintiff, William ODell, was exposed to Roundup at his home in Florida and New York. He used Roundup from the 1980's until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in the spring of 2019 and received treatment in Leesburg, Florida.

171.     Plaintiff, Yaniz Vega, is a resident of the city of Kissimmee, and the state of Florida. She was a resident of the same state at the time of her diagnosis. Plaintiff, Yaniz Vega, was exposed to Roundup at her place of work and at her home in Florida. She used Roundup from 2010 until 2019. Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in October 2016 and received treatment in Orlando, Florida.

172.     During the entire time that Plaintiffs were exposed to Roundup, they did not know that exposure to Roundup® was injurious to their health or the health of others.

173.     Plaintiffs first learned that exposure to Roundup can cause NHL sometime after August 2018.

## TOLLING OF THE STATUTE OF LIMITATIONS

*Discovery Rule Tolling*

174.    Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until well after IARC released its formal assessment of glyphosate in July 2015.  This is the quintessential case for tolling.

175.    Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

176.    Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by Plaintiffs have disclosed that Roundup and glyphosate would cause their illnesses.

177.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

*Fraudulent Concealment Tolling*

178.    All applicable statutes of limitations have also been tolled by Defendant's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

179.    Instead of disclosing critical safety information about Roundup® and glyphosate, Defendant has consistently and falsely represented the safety of its Roundup® products.

*Estoppel*

180.    Defendant was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information

concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

181.    Instead, Defendant knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

182.    Based on the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLAIM ONE

### STRICT LIABILITY (DESIGN DEFECT)

183.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

184.    Plaintiffs bring this strict liability claim against Defendant for defective design.

185.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact them, including Plaintiff, thereby placing Roundup products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.  At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiffs, and/or to which Plaintiffs were exposed, as described above.

186.    At all times relevant to this litigation, Defendant's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiffs.

187.    At all times relevant to this litigation, Defendant's Roundup  products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Alabama and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

188.    Defendant's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

189.    Defendant's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

190.    Therefore, at all times relevant to this litigation, Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

a.      When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.      When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.      When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.      Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.      Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f.      Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.      Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

h.      Defendant could have employed safer alternative designs and formulations.

191.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

192.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

193.    The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.  Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous.  Indeed, at the time that Defendant designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

194.    At the time Roundup products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup herbicides.

195.    Defendant's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

196.    Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant is strictly liable to Plaintiffs.

197.    The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiffs' grave injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

198.    As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiffs have suffered and continues to suffer grave injuries, and has endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.  Plaintiffs will continue to incur these expenses in the future.

199.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM TWO

### STRICT LIABILITY (FAILURE TO WARN)

200.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

201.    Plaintiffs bring this strict liability claim against Defendant for failure to warn.

202.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Defendant.

203.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the

products to consumers and end users, including Plaintiffs, Plaintiffs' employers, Plaintiffs' co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup and glyphosate-containing products.

204.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiffs of the dangers associated with Roundup use and exposure.  Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

205.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

206.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its Roundup products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

207.    Despite the fact that Defendant knew or should have known that Roundup products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure.  The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically

knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs' employers.

208.    Defendant knew or should have known that its Roundup and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.  Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

209.    At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

210.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

211.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

212.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that

were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

213.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiffs to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

214.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

215.    As a result of their inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

216.    Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup products and the risks associated with the use of or exposure to Roundup and glyphosate.

217.    The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained her injuries.

218.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiffs could have avoided the risk of developing injuries as alleged herein and Plaintiffs' employers could have obtained alternative herbicides.

219.    As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiffs have suffered and continue to suffer severe injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.  Plaintiffs will continue to incur these expenses in the future.

220.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM THREE

### NEGLIGENCE

221.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

222.    Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

223.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

224.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup products.  Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

225.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

226.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

227.    Defendant knew or, in the exercise of reasonable care, should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup.

228.    Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

229.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

230.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

231.    Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup.

232.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so.  Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

233.    Defendant's negligence included:

a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.    Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.    Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup products;

h.    Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

i.    Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

j.    Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

k.    Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l.    Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

m.    Advertising, marketing, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known by

Defendant to be associated with or caused by the use of or exposure to
Roundup and glyphosate;

n.    Continuing to disseminate information to its consumers, which indicate or
imply that Defendant's Roundup products are not unsafe for use in the
agricultural, horticultural industries, and/or home use; and

o.    Continuing the manufacture and sale of its products with the knowledge that
the products were unreasonably unsafe and dangerous.

234.    Defendant knew and/or should have known that it was foreseeable that consumers
and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise
ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

235.    Plaintiffs did not know the nature and extent of the injuries that could result from
the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

236.    Defendant's negligence was the proximate cause of the injuries, harm, and
economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

237.    Defendant's conduct, as described above, was reckless.  Defendant regularly risks
the lives of consumers and users of its products, including Plaintiff, with full knowledge of the
dangers of its products.  Defendant has made conscious decisions not to redesign, re-label, warn,
or inform the unsuspecting public, including Plaintiffs.  Defendant's reckless conduct therefore
warrants an award of punitive damages.

238.    As a proximate result of Defendant's wrongful acts and omissions in placing its
defective Roundup products into the stream of commerce without adequate warnings of the
hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered and continues to suffer
severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and

suffering, have suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

239.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM FOUR

### FRAUD, MISREPRESENTATION, AND SUPPRESION

240.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

241.    Defendant fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiffs, both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.

242.    The intentional and/or negligent misrepresentations and omissions of Defendant regarding the safety of Roundup products were communicated to Plaintiffs directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally and/or negligently misrepresented to Plaintiffs and the public with the intent that such misrepresentations would cause Plaintiffs and other potential consumers to purchase and use or continue to purchase and use Roundup products.

243.    Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

244.    Defendant fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiffs, and the consuming public to purchase and use Roundup products. Defendant fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiffs would rely on their false representations and omissions.

245.    Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Osborn & Barr misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

246.    Despite the fact that Defendant knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

49

247.     The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Osborn & Barr.

248.     If Plaintiffs had known the true facts concerning the risks associated with Roundup exposure, Plaintiffs would have used a safer alternative.

249.     Plaintiffs reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiffs were not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

250.     As a direct and proximate result of Defendant's actions and inactions, Plaintiffs were exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

251.     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM FIVE

### VIOLATION OF THE CONSUMER FRAUD ACTS

252.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein. Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident state.

253.    Plaintiff brings this cause of action pursuant to California Business & Professions Code § 17500, California Civil Code §§ 1750 et. seq., in addition to the consumer protection statutes of their home states.

254.    Defendant fraudulently, intentionally, negligently, and/or innocently misrepresented to the public, and to the Plaintiffs, both directly and by and through the media and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup. This deception caused injury to Plaintiff in violation of the Consumer Fraud Act of the Plaintiffs' home states which create private rights of action by the Plaintiffs.

255.    The intentional, negligent, and/or innocent misrepresentations and omissions of Defendant regarding the safety of Roundup products were communicated to Plaintiffs directly through national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally, negligently, and/or innocently misrepresented to Plaintiffs and the public with the intent that such misrepresentations would cause Plaintiffs and other potential consumers to purchase and use or continue to purchase and use Roundup products.

256.    Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

257.    Defendant fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiffs, and the consuming public to purchase and use Roundup products. Defendant fraudulently, intentionally, negligently, and/or innocently, knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiffs would rely on their false representations and omissions.

258.    Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendant misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

259.    Despite the fact that Defendant knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

260.     The fraudulent, intentional, negligent and/or innocent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

261.     If Plaintiffs had known the true facts concerning the risks associated with Roundup exposure, Plaintiffs would have used a safer alternative.

262.     Plaintiffs reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiffs were not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

263.     Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendant.

264.     As a direct and proximate result of Defendant's actions and inactions, Plaintiffs were exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

265.     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM SIX

### WRONGFUL DEATH

266.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein. Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident state.

267.     Plaintiffs bring this claim, where appropriate, on behalf of the Estate and for the Estate and for the benefit of the Plaintiff Decedent's lawful beneficiaries.

268.     As a direct and proximate result of the Defendants and the defective nature of Roundup as outlined above, Plaintiff Decedents suffered bodily injury resulting in pain and suffering, disability to earn, funeral expenses and death.

269.     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM SEVEN

### SURVIVAL ACTION

270.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein. Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident state.

271.     As direct and proximate and result of the conduct of Defendants, where appropriate, Plaintiff Decedents, prior to death, were obligated to spend various sums of money

to treat his or her injuries, which debts have been assumed by the Estate. As a direct and proximate cause of aforesaid, Decedents were caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of his or her death: and, as a direct and proximate result of the aforesaid, Decedents suffered a loss of earning capacity. Plaintiffs bring this claim on behalf of the Decedents' estate under applicable state and/or common laws.

272.    As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of the Plaintiff Decedents until the date of their deaths, Plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Plaintiffs' spouses and heirs, including domestic partners, as Administrators or beneficiaries of the estate of the Decedent, bring the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in their own right.

273.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## JURY TRIAL DEMAND

1.    Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

2.    WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendant, awarding as follows:

A.    compensatory damages in an amount to be proven at trial;

B.    punitive damages;

C.     costs including reasonable attorneys' fees, court costs, and other litigation

        expenses; and

D.     any other relief the Court may deem just and proper.

Dated: September 23, 2019

/s/ *Daniel C. Burke* _____
Daniel C. Burke, Esq.
BERNSTEIN LIEBHARD, LLP.
dburke@bernlieb.com
dweck@bernlieb.com
10 East 40th Street
New York, NY 10016
Tel.: 212-779-1414
Fax: 212-779-3218

*Attorneys for Plaintiffs*

56